

**U.S. Department of Justice**
Complaint Adjudication Office

Agency No. BOP-2017-0031
DJ No.      187-3-4582

*950 Pennsylvania Ave NW*
*Patrick Henry Building, Room A4810*
*Washington, DC 20530*

Mr. Casey Campbell
13109 Berrywood Trail
Fort Worth, Texas 76244

**MAY** 1 6 2019

Dear Mr. Campbell:

This is in reference to the discrimination complaint that you filed against the Federal Bureau of Prisons. Under the federal equal employment opportunity regulations, the Complaint Adjudication Officer renders the final Department of Justice decision on your complaint. Enclosed is the final Department of Justice decision which concludes that the record supports a claim of discrimination based on religion.

### Rights of Appeal

Even with a decision in your favor, you may still wish to file an appeal to contest some aspect of this final decision. You have two alternatives for appeal. First, you have the right to appeal any part of the decision to the Equal Employment Opportunity Commission (EEOC). You may do so by filing your appeal within 30 days of the date you receive this decision. If you are represented by an attorney of record, the 30-day appeal period shall begin to run the day your attorney receives this decision. The appeal must be in writing. The EEOC prefers that you use EEOC Form 573, Notice of Appeal/Petition to file an appeal; a copy of Form 573 is attached to this letter. The Notice of Appeal should be sent to Carlton Hadden, Director, EEOC, Office of Federal Operations. You may send the appeal to Director Hadden by mail at P.O. Box 77960, Washington, D.C. 20013, by facsimile at 202-663-7022 (must be no longer than 10 pages), or you can hand-deliver it at 131 M Street N.E., Washington, D.C. 20507. You must also send a copy of your notice of appeal to Carolyn Sapla, EEO Officer, Federal Bureau of Prisons, 320 First St. NW, Rom 936, Washington, DC, 20013. Either on, or attached to, the Notice of Appeal that you send to Director Hadden, you must state the date and method by which you sent the copy of your notice of appeal to Ms. Sapla.

Second, you have the right to file a civil action in the appropriate United States District Court within 90 days of the

date you receive this decision.  In filing your federal
complaint you should name William P. Barr, Attorney General, as
the defendant.  Even if you appeal this decision to the EEOC,
you still have the right to go to federal court: you may file a
civil action in United States District Court within 90 days of
the day you receive the EEOC's final decision on your appeal, or
after 180 days from the date you filed your appeal with the
EEOC, if the EEOC has not decided the appeal by then.

        If you cannot afford to file a civil action, you can ask
the court to allow you to file the action at no cost to you.
The court may also provide you with an attorney if you cannot
afford to hire one to represent you in your civil action.
Questions concerning when and how to file a waiver of costs
should be directed to your attorney or the District Court clerk.


                                        Sincerely,



                                        Robert K. Abraham
                            Acting Complaint Adjudication Officer



cc:   Carolyn Sapla
      Richard Toscano

*The U.S. Equal Employment Opportunity Commission*

## NOTICE OF APPEAL/PETITION
## TO THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

OFFICE OF FEDERAL OPERATIONS
P.O. Box 77960
Washington, DC 20013

**Complainant Information:** (Please Print or Type)

| | |
|---|---|
| Complainant's name (Last, First, M.I.): | |
| Home/mailing address: | |
| City, State, ZIP Code: | |
| Daytime Telephone # (with area code): | |
| E-mail address (if any): | |

**Attorney/Representative Information (if any):**

| | |
|---|---|
| Attorney name: | |
| Non-Attorney Representative name: | |
| Address: | |
| City, State, ZIP Code: | |
| Telephone number (if applicable): | |
| E-mail address (if any): | |

**General Information:**

| | |
|---|---|
| Name of the agency being charged with discrimination: | |
| Identify the Agency's complaint number: | |
| Location of the duty station or local facility in which the complaint arose: | |
| Has a **final action** been taken by the agency, an Arbitrator, FLRA, or MSPB on this complaint? | _____Yes; Date Received _____ (Remember to attach a copy)<br>_____No<br>_____This appeal alleges a breach of settlement agreement |
| Has a complaint been filed on this same matter with the EEOC, another agency, or through any other administrative or collective bargaining procedures? | _____No<br>_____Yes (Indicate the agency or procedure, complaint/docket number, and attach a copy, if appropriate) |
| Has a civil action (lawsuit) been filed in connection with this complaint? | _____No<br>_____Yes **(Attach a copy of the civil action filed)** |

**NOTICE**: Please **attach a copy of the final decision or order** from which you are appealing. If a hearing was requested, please attach a copy of the agency's final order and a copy of the EEOC Administrative Judge's decision. Any comments or brief in support of this appeal MUST be filed with the EEOC **and** with the agency **within 30 days** of the date this appeal is filed. The date the appeal is filed is the date on which it is postmarked, hand delivered, or faxed to the EEOC at the address above.

| Signature of complainant or complainant's representative: | |
|---|---|
| Date: | |

**EEOC Form 573 REV 1/01**

## PRIVACY ACT STATEMENT

(This form is covered by the Privacy Act of 1974. Public Law 93-597. Authority for requesting the personal data and the use thereof are given below.)

1. **FORM NUMBER/TITLE/DATE**: EEOC Form 573, Notice of Appeal/Petition, January 2001

2. **AUTHORITY**: 42 U.S.C. § 2000e-16

3. **PRINCIPAL PURPOSE**: The purpose of this questionnaire is to solicit information to enable the Commission to properly and efficiently adjudicate appeals filed by Federal employees, former Federal employees, and applicants for Federal employment.

4. **ROUTINE USES**: Information provided on this form will be used by Commission employees to determine: (a) the appropriate agency from which to request relevant files; (b) whether the appeal is timely; (c) whether the Commission has jurisdiction over the issue(s) raised in the appeal, and (d) generally, to assist the Commission in properly processing and deciding appeals. Decisions of the Commission are final administrative decisions, and, as such, are available to the public under the provisions of the Freedom of Information Act. Some information may also be used in depersonalized form as a data base for statistical purposes.

5. **WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION**: Since your appeal is a voluntary action, you are not required to provide any personal information in connection with it. However, failure to supply the Commission with the requested information could hinder timely processing of your case, or even result in the rejection or dismissal of your appeal.

Send your appeal to:

The Equal Employment Opportunity Commission
Office of Federal Operations
P.O. Box 77960
Washington, D.C. 20013

*This page was last modified on January 9, 2009.*

**U.S. Department of Justice**
Complaint Adjudication Office

Agency No. BOP-2017-0031
DJ No.      187-3-4582

───────────────────────────────────────

*950 Pennsylvania Avenue NW*
*Patrick Henry Building, Room A4810*
*Washington, DC 20530*

DEPARTMENT OF JUSTICE FINAL AGENCY DECISION

in the matter of

MAY 1 6 2019

Casey Campbell v. Federal Bureau of Prisons

Complainant, Casey Campbell, works as a chaplain at the Federal Bureau of Prisons' (BOP's) Carswell, Texas institution. He filed an employment discrimination complaint against the BOP under Section 717 of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16 (Title VII) and 29 C.F.R. 1614.101(a).

The issue here is whether BOP discriminated against complainant because of his Protestant religion when a Catholic chaplain made disparaging remarks about Protestant chaplains, refused to escort non-Catholic volunteers, and failed to supervise non-Catholic activities, leaving non-Catholic chaplains like complainant with extra work. ROI 44.

## Facts

### I.   Complainant's Allegation

Complainant, a Baptist prison chaplain, claims that a Catholic chaplain, William Onuh, routinely harassed him and other Protestant chaplains. ROI 56. Onuh made scornful comments to complainant and to inmates, yelled at complainant, interfered with his work, and refused to serve non-Catholic inmates and volunteers — leaving complainant and other chaplains to pick up the slack. Complainant claims Onuh "had a pattern of behavior that is prejudiced against non-Catholics over the entire course of his tenure at FMC Carswell." ROI 58.[1]

#### A.   Onuh's Harassment of Complainant

From early in their working relationship, complainant maintained, he was unable to "spend more than an hour with

───────────────────────────────────────

[1]   Onuh has worked at Carswell since 2012.  ROI 83.

Chaplain Onuh without him becoming bellicose and yelling at
[complainant] or someone else." ROI 129. Complainant
repeatedly complained to managers about scheduling conflicts
between himself and Onuh, problems with shared office space, and
"unprofessional conduct." ROI 132-134. He admitted he did not
"like, trust, or appreciate Chaplain Onuh," who he described as
"both irrational and emotionally unstable." ROI 130, 123. In
2013, complainant suggested separate office space might help,
but management did not provide it. ROI 127. Soon afterwards,
complainant moved out of a shared office with Onuh and began to
use a former storage closet for his belongings. ROI 129.

"[O]n a couple of occasions," complainant said, Onuh told
him "that white evangelicals and Republicans are ruining the
country." ROI 59. In 2013, Onuh "belitt[ed] and berat[ed]"
another Protestant chaplain, Chaplain Stephens, "to the point of
tears for several weekends in a row." ROI 127.[2]

Complainant's problems with Onuh continued into 2014. In
June 2014 he and Onuh got into a heated email exchange after
Campbell declined to take a phone call about a death
notification and asked the front desk officer to ask Onuh to do
it. ROI 138. Also that month, complainant emailed a Human
Resources Manager reporting that Onuh "becomes belligerent
whenever he is asked to do anything that does not directly
involve Roman Catholics." ROI 132, 139. He wrote a Catholic
Bishop, too, to complain that Onuh "argues with everything and
everyone" so that "staff meetings are almost unbearable when he
is present." ROI 136. Complainant even considered transferring
to another institution, he said, but could not "financially
afford to do so." ROI 135.

Onuh's harassment continued, and in recent years Onuh made
disparaging comments about complainant and Supervisory Chaplain
Jonathan Clark. He has called the Protestant chaplains "boys"
and has told complainant he was "worthless." ROI 59. In 2017,
Onuh told inmates in his congregation that the Catholic
congregation was "under attack & being persecuted." ROI 58, 61,
146-148, 151-153. He said Protestant services were "just
entertainment." ROI 59.

---

[2] Stephens' first name is not in the record.

2

In complainant's view, and as a result of Onuh's actions and behavior, his "faith [was] ridiculed by a fellow employee in a public setting." ROI 61. Furthermore, the remarks "put the safety and security of [the] institution's staff at risk (by inciting the inmates against [Onuh's] fellow chaplains)." Complainant's May 12, 2018 Statement to the Complaint Adjudication Office at 8-9.

### B.   Onuh's Refusal to Serve Non-Catholic Volunteers and Inmates

In addition to contemptuous comments, complainant claims, Onuh routinely refused to escort and supervise non-Catholic volunteer groups, leaving other chaplains to fill in for him. ROI 60, 156.  Chaplains must "share pastoral duties, supervision of inmate groups, and administrative functions," according to complainant.  ROI 61.  This includes recruiting, training, and supervising volunteers of other faiths.  ROI 61.  Indeed, the chaplain's job description stipulates that they "[p]rovide a full pastoral ministry to inmates of all faith groups."  ROI 121.  Normally, as complainant described it, volunteers coming in to lead religious activities report to the front lobby and a chaplain takes them inside.  ROI 59.  This is "one of the most basic duties for any chaplain," complainant said.  ROI 59.  But Onuh, complainant reported, has "stated that he is a 'Catholic chaplain'" as a way of explaining his unwillingness to assist certain volunteers.  ROI 61.

Onuh failed to escort non-Catholic volunteers even when managers had assigned him to oversee an event with the volunteers, complainant asserted.  ROI 156.  Managers have, at times, instructed complainant to alter his activity schedule to transport volunteers that Onuh refused to serve.  ROI 60.  As complainant sees it, he "is being discriminated against when [he is] expected to escort and supervise volunteers as part of the conditions of [his] employment" and Onuh "is allowed to choose when and whether he will perform those same duties."  ROI 61.

In early February 2017, a Seventh Day Adventist volunteer and a Mormon volunteer came to the prison and waited to meet with a women's group, but could not do so because they had no

escort.  ROI 58, 144.[3]  Even though he was the only chaplain on
duty, Onuh refused to escort the volunteers.  ROI 27.  In the
meantime, the inmates had gathered for the planned meeting at
the appointed time only to find the religious services
department closed.  ROI 149.  "This has occurred now on several
occasions," an inmate recounted in filing a complaint, and "[i]t
is always when Chaplain Onuh is left to run the [Religious
Services] Dep[artment]."  ROI 149.  Onuh "disregards all other
services and is only concerned with his (catholic)," the inmate
said, and she and "others find it discriminating."  ROI 149.

    On March 9, 2017, Onuh again refused to escort non-Catholic
volunteers.  This time Chaplain Beverly Ford stayed beyond her
scheduled shift, working overtime, to accommodate a Protestant
activity managers had assigned Onuh to facilitate.  ROI 27, 58.

    For some 18 weeks starting August 17, 2017, complainant
reported, Mentor Coordinator Kathy Mobley "had to adjust her
work routine" to support a recurring Thursday morning Protestant
activity.  ROI 119.  Onuh was assigned to oversee the event, but
he "either d[idn't] show up, or fail[ed]/refuse[d] to supervise
the program."  ROI 119.  Accordingly, Mobley covered for Onuh on
all but two Thursdays.  ROI 119.

    According to complainant, Onuh "has only ever refused to
escort non-Catholic volunteers."  Complainant's May 12, 2018
Statement to the Complaint Adjudication Office at 6.  When Onuh
does escort non-Catholics, complainant maintained, he treats
them rudely and arrives late.  ROI 30.  In response volunteers
"regularly express their frustrations," complainant reported,

_____

[3]  Complainant reported that Onuh refused to escort a Mormon and
a Seventh Day Adventist volunteer on February 9.  ROI 30, 58.
An unidentified volunteer emailed the prison reporting that the
sender and a Seventh Day Adventist volunteer were turned away on
February 4.  ROI 144.  An inmate similarly complained that on
February 4 Onuh failed to open Religious Services for the
Seventh Day Adventist group to meet with volunteers.  ROI 149.
Given the similar descriptions of the event, it seems likely
that these sources describe the same incident and complainant
may be mistaken on the exact date.

with Onuh's "demeanor/attitude toward them."  ROI 30.[4]
Complainant also said that the February and March 2017 incidents
were "not the only times [Onuh] has refused or threatened to
refuse to escort non-Catholic volunteers."  ROI 59.
Furthermore, because Onuh "could not be relied upon to provide
the community with the elements necessary for their service on a
consistent and timely manner," complainant explained, the prison
had to change the schedule for Native American worship.  ROI 58.

    As late as March 2018, Onuh left the main facility and went
to the prison camp, complainant asserts, so that he would not
have to escort a Christian Science volunteer.  ROI 66.  Instead,
complainant assisted the volunteer.  ROI 66.  Also that month,
after BOP assigned Onuh a shift overlapping with two other staff
members, staff conferred and decided to be "especially careful
to escort the volunteers every week in order to save them from
having to interact with Chaplain Onuh."  ROI 67.  As complainant
sees it, "his behavior has gone on for so long, that many people
don't even realize how many changes have to be made in order to
accommodate him."  ROI 67.

    Onuh also went out of his way, complainant believes, to
interrupt a Protestant service in March 2018.  ROI 66.  Onuh has
announced and scheduled Catholic services to take place in the
space complainant had previously reserved for Protestant
services.  ROI 66, see also ROI 147-148.

    In complainant's estimation these incidents show that Onuh
"is prejudiced against non-Catholics."  ROI 58.  Indeed, Onuh
has stated "that he is a 'Catholic chaplain' giving clear
indication that he believed that he was not an ordinary chaplain
and subject to sharing all of the ordinary chaplain tasks."  ROI
61.

    C.    Complainant's Reports to Managers

    Complainant said that he has repeatedly spoken to managers
about his problems with Onuh.  Years before filing his EEO

_____

[4]  The investigator requested a list of the volunteers chaplains
escorted between February 5 and March 9, 2017, but BOP did not
provide this information.  ROI 54.

complaint, complainant spoke to former Supervisory Chaplain
Robert Danage "on several occasions" reporting Onuh's refusal to
serve non-Catholics.  ROI 62; see also ROI 16.[5]  He told Danage
that he, "as a Protestant . . . was being asked to do more than
Chaplain Onuh."  ROI 62.  Indeed, complainant said, Onuh told
Danage in a staff meeting in front of everyone that he "'would
not' escort and supervise the groups he had been assigned."
Complainant also relayed Onuh's comments that "white
evangelicals were ruining the country."  ROI 61.  In response,
Danage told complainant to "let it go."  ROI 61.  He explained
that "Catholic priests have 'a lot of pull'" and he was
unwilling to try to correct Onuh's behavior.  ROI 62.  Danage
also said that he "was afraid of having an EEO claim made
against him if he tried to make Chaplain Onuh perform his duties
like any other chaplain," complainant reported.  ROI 62.
Complainant in turn asked Danage "why he wasn't afraid that
[complainant] would file an EEO complaint."  ROI 62.  Danage
told complainant that executive staff had instructed him to
"'manage around' Mr. Onah."  ROI 66.

    Complainant also reported problems to Associate Warden
Schuman and Warden Jody Upton in 2013.  ROI 127-129.[6]
Complainant said he told the Warden he wanted to file an EEO
complaint, but worried "the process would be too long."  ROI 62.
The Warden told complainant to "just overlook Chaplain Onuh's
attitude, comments, and behavior," complainant reported.  ROI
61.  In response to complainant's concerns, the Associate Warden
suggested that complainant "use [his] pastoral skill to reason
with" Onuh and defuse tensions.  ROI 127.  Managers generally
advised complainant to "ignore" Onuh.  ROI 62.

    Complainant claimed then Associate Warden Schuman refused
to intervene in another chaplain's struggles with Onuh.  When
"it came to light" that Onuh harassed Chaplain Stephens "to the
point of tears for several weekends in a row," Schuman told her
to "be more assertive."  ROI 127.  In the Associate Warden's

---

[5]  Complainant did not remember when this occurred.  However,
Clark has been Supervisory Chaplain since April 2015, so it is
likely that the exchange occurred before then.  ROI 88.

[6]  Associate Warden Schuman's first name is not in the record.

opinion, complainant and Stephens "were equally responsible for the conflict and problems that [they] had been experiencing with Chaplain Onuh." ROI 132.

In 2014 complainant wrote to Jonna Hawk, the Human Resources Manager, to report Onuh's reluctance to serve non-Catholics. He claimed that managers dealt with Onuh by simply not asking him "to perform the routine duties that the rest of us are asked to perform." ROI 132, 139. Complainant requested that he not work alone with Onuh. ROI 132. He also told Hawk he had stopped reporting his concerns to managers because "the administration was not going to take [his] concerns seriously." ROI 132.

Based on these interactions, complainant characterized BOP managers' response as "inaction over the years." ROI 66. As complainant sees it, in the year since his 2017 EEO complaint he has "seen no change in Chaplain Onuh's behavior toward [him] or the programs [complainant] facilitate[s] and provide[s]." ROI 66. Complainant reports that Onuh "continues to make snide, sarcastic, and/or disparaging remarks about [complainant and Clark] to the inmate population." ROI 66. He assumes no "effective training or discipline has taken place." ROI 66.

II.   Witness Testimony

    A.   Chaplain William Onuh

Onuh maintains that he has never "said or written anything negative about [complainant]." ROI 83. According to Onuh, he and complainant do not get along; complainant "resents [Onuh's] presence and would not like to have [him] around," Onuh believes. ROI 85. He claims complainant "has written [Onuh] up several times," and once packed up his belongings while Onuh was on vacation. ROI 85.

Onuh complained of a "chaotic period Chaplains Clark and [complainant] created," causing scheduling mishaps. ROI 83. One day during this time, Onuh said, a volunteer arrived and none of the chaplains had advance notice. Onuh was busy in the chapel, and another chaplain escorted them after calling Clark at home to verify the visitors. ROI 83. Onuh reported he "was

written up for this incident" and received a "reprimand." ROI 83. He has never made pejorative comments about Protestant chaplains or refused to escort non-Catholic volunteers, Onuh insists. ROI 84.

B.   Supervisory Chaplain Jonathan Clark

Clark, complainant's supervisor since 2015, reported that inmates came to him with concerns about Onuh's comments about other chaplains. ROI 89. Inmates said Onuh called Protestant Chaplains "liars" and "boys." ROI 89. In an email to Clark on February 8, 2017, one inmate reported that, at mass, Onuh "took the opportunity to bad mouth [Clark], [complainant], and Religious Services" and "[t]his was basically the theme of the entire Mass." ROI 143.

Another inmate, in a February 6, 2017, letter to Clark, said that Onuh announced at mass "that the Catholic community was under attack & being persecuted." ROI 146. In the homily that day, the inmate reported, Onuh said that the Religious Services Administration "plotted and schemed to undermine him" and that officials were "jealous" of high attendance at Catholic services. ROI 146. Onuh vowed to "stand his ground" on keeping an 8:00 a.m. Sunday slot for mass "as long as he is the Catholic Chaplain." ROI 147. Although mass was scheduled for 1:45 p.m. the next Sunday, Onuh said that inmates should ignore bulletins or announcements and come at 8:00. ROI 148. He reminded them that "the community was under persecution," and that they needed to "stand together." ROI 148. The effect, the prisoner said, was to "g[e]t a few inmates riled up." ROI 148.

On February 19, Onuh gave a second disruptive sermon, claiming again that the Catholic community was "under attack" and accusing Religious Services of "tell[ing] [inmates] lies," including "lies" about Onuh. ROI 151-153. He asserted that the "Protestant chaplains" should take over duties at the outlying facility, the prison camp, where he apparently preferred not to work. ROI 154. Onuh suggested that a time change in scheduled services that the other chaplains had imposed could undermine attendance at Catholic services. ROI 154. Onuh also denounced Nell Blackerby, a Catholic contractor in Religious Services, accusing Blackerby and Clark of "[going] to the Bishop" about

him, and declaring that "the Bishop here has no control over
[him.]"  ROI 152.  In addition, Onuh told inmates he had no duty
to supervise volunteers, and that BOP should not "spend money on
foolishness" like the volunteer program.  ROI 154.  Clark said
he informed BOP leadership about the inmate complaints.  ROI 91.

After Onuh refused to escort non-Catholic volunteers, Clark
"had several conversations" with him about it and "issued verbal
reprimands."  ROI 90.  Indeed, he went so far as to refer Onuh
to Special Investigative Services for misconduct.  ROI 90.[7]  On
March 15, 2017, Clark wrote Warden Upton to report Onuh for
failing to follow his instructions and escort volunteers on
March 10, leaving Ford to pick up the slack.  ROI 159.  In the
memo, Clark did not detail Onuh's pattern of refusing to escort
non-Catholic volunteers.  ROI 160.

Clark acknowledged that all chaplains are responsible for
escorting volunteers for religious services.  ROI 90.  Chaplains
are each "endorsed by their own religious traditions," he
explained, but must also "facilitate inmates of all religious
faiths [with] opportunities to pursue individual religious
beliefs and practices."  ROI 91.

After complainant told Clark about harassment, Clark
informed complainant that he could seek help from the Employee
Assistance Program or talk to an EEO counselor.  ROI 91.  He
assured complainant that he "was addressing the concern of
volunteers not being escorted."  ROI 91.  When an EEO counselor
spoke to Clark on March 28, 2017, Clark said he knew about the
issues with Onuh and had explained the problems to his
supervisor.  ROI 27.  In his interview with the investigator,
Clark reiterated that he had "voiced [complainant's] concerns to
the Executive Staff."  ROI 91.

In Clark's view, Onuh subjected complainant to
discrimination based on his faith, and he discriminated against
others as well.  ROI 91.  Onuh and complainant have a "strained"
working relationship, as Clark describes it, and in Clark's view
"Onuh sees workplace relationships as Protestants vers[u]s

---

[7]  Clark did not specify when he referred Onuh for investigation.
ROI 90.

9

Catholics." ROI 91. Clark attributed this "to [Onuh's] own
religious perspective" — he "is difficult to work with because
he doesn't like to work with other faith groups." ROI 91.
Clark affirmed that another Protestant chaplain, Ford, has been
asked to work overtime because Onuh refused to escort Protestant
volunteers. ROI 90.

Clark himself "would have filed an EEO complaint much the
same as [complainant's]," he said, and he "may still" do so.
ROI 92. But because Onuh has filed so many grievances against
Clark, he worries any complaint would be seen as retaliation.
ROI 92.

C.   Associate Warden Catricia Howard

Howard is Clark's supervisor and complainant's second-line
supervisor. She reported that Clark emailed her on March 16,
2017, about "an allegation of prejudice and harassment
[involving] Chaplain Onuh." ROI 75-76. The email described
"pejorative comments" that Onuh allegedly made about Protestant
chaplains and claims that Onuh refused to escort non-Catholic
volunteers, Howard said. ROI 76, 80.

Howard provided the email she described to the
investigator, and in it complainant asked "to make a formal
complaint about the long standing prejudice and harassment" from
Onuh, including "negative comments" about complainant,
assertions that his services are "mere entertainment," and
refusal to perform chaplain duties for non-Catholics. ROI 80.
According to complainant, all this had created an "atmosphere of
anxiety" in the department. ROI 80.

In response to the email, Howard said, Clark "was advised
to speak to Chaplain Onuh about the allegations." ROI 78.
Howard assured the EEO counselor on April 6, 2017, that she had
"referred" complainant's concerns "for appropriate action" but
provided no further elaboration. ROI 27. She did not believe
Onuh had subjected complainant to discrimination. ROI 78.

In describing the chaplains' duties to the investigator,
Howard explained that chaplains at the prison "are responsible
for the supervision and administration of all religious programs

as well as other religious activities." Each should "provide full pastoral ministry to inmates of all faith groups." ROI 78.

D.   Warden Jody Upton

Upton, Warden since 2013, described "being sent an email" from complainant "expressing some concerns" about Onuh's treatment of him. ROI 70.[8] The Warden did not remember talking to either complainant or Onuh about the issues. ROI 70. The two had "interpersonal communication issues" in the Warden's opinion, and Upton did "not recall ever discussing a discrimination concern" with complainant. ROI 72.

Upton acknowledged that Onuh once disregarded Chaplain Clark's direction to escort volunteers, ROI 69, 71. The warden did not know the volunteers' religion. ROI 71. In general, Upton explained, approved volunteers arrive at the institution throughout the week and a chaplain escorts them to services or to other activities. ROI 71. A chaplain's faith group plays no role in assigning escort duties. ROI 72. In fact, any employee can be tasked with escorting visitors. ROI 71.

E.   Chaplain Beverly Ford

Protestant Chaplain Beverly Ford recalled a time when Onuh refused to escort volunteers, even after Clark directed him to do so. ROI 95. Onuh told Ford he would not escort the volunteers because he was busy with his own religious activities. ROI 95. Ford escorted the volunteers herself. ROI 95.

Ford believed that at times, some volunteers were not escorted into the prison but she "was not involved in the particulars." ROI 96. She did not know of Onuh calling Protestant ministers "boys" or "liars." ROI 95.[9] Complainant

---

[8]   Upton did not specify the email's date. ROI 70.

[9]   Chaplain Farid Farooqi also testified that he had no knowledge of such insults, and that he did not observe Onuh refusing to escort non-Catholic volunteers. ROI 107. He believed there

11

and Onuh "have had disagreements (issues) on and off," Ford said. ROI 97. She did not opine on what motivated their disagreements. There was "a hostile work environment" at times, but, she maintained, "[i]t's not about religion." ROI 97.

### F. Chaplain Rachel Floyd

Floyd, another Protestant chaplain, worked at Carswell from 2012 until 2014. ROI 101. Onuh showed "disrespect towards [her] and other Protestant Chaplains," she reported, and "disregard" for his duties to escort volunteers regardless of their faith. ROI 103. For example, Floyd saw Onuh refuse to escort Protestant volunteers and supervise Protestant activities. ROI 101, 103. In her years there, he "often refused to escort non-Catholic volunteers." ROI 102. As a result, Floyd said, every Saturday she worked she was responsible for escorting volunteers because Onuh "refused to bring them in." ROI 102. And on Saturdays when she did not work, volunteers "had to leave the institution" without being able to participate in the scheduled meeting or activity because Onuh would not escort them. ROI 102.

In Floyd's view, complainant's job "was often made more difficult by Chaplain Onuh refusing to supervise other faith groups and their volunteers." ROI 104. She pointed out by way of contrast that BOP Program Statement 3939.07 requires chaplains to "[s]hare pastoral duties, supervision of inmate groups, and administrative functions equitably." ROI 103.

Floyd said she believed complainant endured discriminatory treatment and that she "personally witnessed and experienced Chaplain Onuh's disrespect towards [her]self and other Protestant [c]haplains." ROI 103. Once, Floyd reported, Onuh told a female Protestant chaplain "that she was not a chaplain because she was female." ROI 101.

Floyd also admitted she was "not sure" how much religion influenced Onuh's mistreatment of coworkers because he "showed disrespect to most co-workers" and "was rude, disrespectful and

---

were "personal issues between" complainant and Onuh, rather than religious issues. ROI 108.

12

overall very hard to work with." ROI 104. As a result, Floyd
"avoided" Onuh as much as possible because of his "short
temper." ROI 101.

     G.   Mentor Coordinator Kathy Mobley

    Mobley said she has spoken to complainant and observed that
he seemed "very troubled" by the alleged harassment and felt "at
a loss" for what to do. ROI 113. Indeed, complainant has
confided in her "several times over the course of the last
several years" about potential religious discrimination. ROI
116. In addition, "several inmates," she reported, had told her
that Onuh made derogatory comments about Protestant chaplains.
ROI 114. However, Mobley did not hear Onuh make such
statements. ROI 113.

    Mobley has often sought help in correcting Onuh's behavior.
For example, she spoke to human resources personnel on three
occasions and twice reported him to BOP internal investigators.
ROI 116. She communicated problems to union leaders, her
supervisor (Clark), and her former supervisor (Danage). ROI
116. "Everyone seems to acknowledge that it is difficult to
work with him." ROI 116. In particular, she said, "female
inmates find it impossible to please him." ROI 116. But "no
one address[es] the fact that his behavior is not acceptable and
should not be tolerated in the worksite. . . . So we all just
stay clear." ROI 116. Mobley admitted she tries to avoid Onuh.
ROI 116. "Letting him do his thing, makes everyone feel less
threatened." ROI 116.

    As Mobley sees it, Onuh does not escort volunteers "unless
he absolutely has no other choice," and this "adds a lot of
extra stress on those who work with him . . . who must pick up
the extra work load." ROI 114. Ford, for instance, has had to
"work comp time" to supervise activities after Onuh refused to.
ROI 115. Mobley has also "covered Volunteer Programming because
[Onuh] would not escort the Volunteers." ROI 115. She feels
obligated "to ensure coverage" because she does not want
volunteers "to feel they are not appreciated or valued for
th[eir] services." ROI 115. On one occasion she recounted,
Onuh and Farooqi were the only two staff working the evening
shift and Onuh refused to escort a Protestant group. Farooqi

had to cover for him.  ROI 115.  By way of explanation, Mobley
speculated Onuh might see escorting visitors as "beneath him."
ROI 114.

Mobley wondered if Onuh acted because of religion or if he
"just is not willing to do anything that he does not absolutely
have to do."  ROI 114.  Onuh, in her observation, "just is not a
Team Player and is only willing to do what will serve him or his
own needs."  ROI 114.  He is the only Catholic leader and "has
an issue with most everyone in the Department," Mobley
confirmed, leaving her "unsure" whether his attitude was based
on religion.  ROI 115.

### Analysis

Complainant claimed that he was discriminated against
because of his Protestant religion when Chaplain Onuh made
disparaging remarks about Protestant chaplains, refused to
escort Protestant and other non-Catholic volunteers, and
declined to supervise Protestant activities — leaving Protestant
chaplains like complainant with extra work.  ROI 44.
Complainant said that he raised these issues repeatedly with BOP
senior managers and they took no corrective action.  Federal
employers may not discriminate against employees based on
religion.  42 U.S.C. § 2000e-16; see also 29 C.F.R. § 1614.101.
Discrimination can include treating "some people less favorably
than others" because of their protected characteristic.
International Brotherhood of Teamsters v. United States, 431
U.S. 324, 335 n.15 (1977).

Discriminatory actions prohibited by Title VII include
"creat[ing] a hostile or abusive work environment."  Meritor
Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986).  A hostile
workplace "is permeated with 'discriminatory intimidation,
ridicule, and insult' . . . that is 'sufficiently severe or
pervasive to alter the conditions of [one's] employment and
create an abusive working environment.'"  Harris Sys., Inc., 510
U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, 477 U.S. at 65,
67).

Antidiscrimination law is not a "general civility code" for
employees and does not assuage "the ordinary tribulations of the

14

workplace, such as the sporadic use of abusive language" and
"occasional teasing." Faragher v. City of Boca Raton, 524 U.S.
775, 788 (1998) (internal quotation marks omitted). Nor are
"trivial harms" or "minor annoyances" actionable. Burlington N.
& Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). Instead,
harassing "conduct must be extreme" before it becomes the
subject of legal action. Faragher, 524 U.S. at 788. Incidents
like "slights," "occasional name-calling, rude emails, lost
tempers and workplace disagreements" are "uncognizable" under
federal antidiscrimination law, and Title VII does not provide
relief for "personality conflicts." Baird v. Gotbaum, 792 F.3d
166, 171 (D.C. Cir. 2015) (internal quotation marks omitted).

In determining whether alleged conduct is sufficiently
severe or pervasive to have violated Title VII's prohibition of
a hostile work environment, the fact-finder looks at all the
circumstances. Harris, 510 U.S. at 23. These include the
"frequency of the discriminatory conduct, its severity, whether
it is physically threatening or humiliating, or a mere offensive
utterance, and whether it unreasonably interferes with an
employee's work performance." Flowers v. Southern Reg'l
Physician Servs. Inc., 247 F.3d 229, 236 (5th Cir. 2001). A
series of incidents may amount to a hostile environment if they
are "more than episodic; they must be sufficiently continuous
and concerted in order to be deemed pervasive." Perry v. Ethan
Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (internal
quotation marks omitted).

Importantly, the record "must demonstrate that the conduct
occurred because of" complainant's protected characteristic.
Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).

With respect to harassment on the basis of religion, it is
noted at the outset that Title VII does not generally extend to
actions within religious institutions. Hosanna-Tabor
Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171, 188,
(2012). In this case, however, the institution in question is a
federal penal institution and chaplains at the institution are
not exempt from Title VII. Religious animus must not be a
factor in chaplains' treatment of each other or assignment of
their secular duties. As the Seventh Circuit explained in
adjudicating a claim by a Veterans Administration hospital

15

chaplain, a chaplain "is not simply a preacher but a secular employee hired to perform duties for which he has, by dint of his religious calling and pastoral experience, a special aptitude." The court saw "no reason to analyze this case differently from the typical Title VII case." Baz v. Walters, 782 F.2d 701, 705 (7th Cir. 1986). Similarly, in considering a case against the District of Columbia Department of Corrections, another federal judge has remarked that "religious affiliation is, at best, a matter of secondary importance" for prison chaplains, who must serve inmates of all faiths. Rasul v. D.C., 680 F. Supp. 436, 440 (D.D.C. 1988).

An institution may fire a chaplain who "would not conform his ministry" to the institution's "multidisciplinary" and "ecumenical approach." Baz, 782 F.2d at 704, 709. And a preference for chaplains of a particular faith may violate Title VII. Heffernan v. Dep't of Health and Human Serv., EEOC Appeal No. 0320060079, 2007 WL 313336, at *11 (Jan. 24, 2007).

## I.   A Hostile Work Environment

Complainant claimed Chaplain Onuh created a hostile environment motivated by religious bias when he treated complainant harshly, made insulting statements about Protestants, and refused to serve non-Catholic inmates and volunteers. Onuh scheduled Catholic services in the time and place complainant had reserved for Protestant worship, interrupted Protestant worship, and refused to escort non-Catholic volunteers – resulting in cancelled meetings. ROI 60, 66, 119, 147-149, 156. A review of Onuh's behavior leads to the conclusion that his actions were "'sufficiently severe or pervasive to alter the conditions of [complainant's] employment and create an abusive working environment.'" Harris, 510 U.S. at 21 (quoting Meritor Sav. Bank, 477 U.S. at 65, 67). His mistreatment was "more than episodic" as it took place over several years. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997); ROI 62, 127, 129, 136. Sometime before April 2015, complainant told his supervisor about Onuh's derogatory comments and how he, "as a Protestant . . . was being asked to do more than Chaplain Onuh." ROI 62. Complainant reported similar problems in 2017 and 2018. ROI 27, 58, 66, 119, 146.

16

Others confirmed that Onuh's behavior was pervasive and longstanding.  Mobley said complainant confided in her "several times over the course of the last several years" about potential religious discrimination.  ROI 116.  Floyd, who left Carswell in 2014, said Onuh "often refused to escort non-Catholic volunteers" while she worked there.  ROI 102.

Inmates, too, noticed Onuh's religious bias.  One prisoner who complained about Onuh's refusal to supervise non-Catholic worship observed this behavior "on several occasions."  ROI 149. The pattern here is "sufficiently continuous and concerted in order to be deemed pervasive."  Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997).

Other harassing incidents include the times when Onuh made derogatory comments about complainant and his Protestant coworkers.  He said complainant's Protestant services were "just entertainment," called the Protestant chaplains "boys," said they lied, and told complainant he was "worthless."  ROI 59. Onuh also made pejorative generalizations about Protestants, accusing evangelicals like complainant of "ruining the country." ROI 59.  Such statements further contribute to a finding that Onuh's conduct was sufficiently pervasive to violate Title VII. The Commission has found similar belittling and humiliating statements about an individual's religion may support a finding of religious harassment.  See Hurston v. United States Postal Serv., EEOC Appeal No. 01986458, 2001 WL 65204, at *2 (Jan. 19, 2001) (finding harassment when, among other things, a co-worker characterized an employee's Wiccan observances as "frolic[ing] with the nymphs"); Lashawna C. v. Dep't of Labor, EEOC Appeal No. 0720160020, 2017 WL 664453, at *5–6 (Feb. 10, 2017) (holding manager's single comment to Jewish subordinate that he "work[ed] like a Hebrew slave" constituted harassment).  The Commission has also found harassment where, among other things, a manager called an employee's halal food "pagan."  Sabir v. Dep't of Health and Human Servs., EEOC Appeal No. 01993859, 2002 WL 31107304, at *5 (Sept. 11, 2002).

Onuh's harassment affected complainant's working conditions.  According to complainant, Onuh frequently "yell[ed]," conducted "outbursts and tirade[s]," and "bec[ame] bellicose."  ROI 129, 133.  At some point, to get away from this

behavior, complainant moved out of his office. ROI 129. See Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 333 (4th Cir. 2003) (noting harassment was sufficiently severe when it "drove [plaintiff] from the room" and "surely made it more difficult for her to do her job").

Onuh's actions also altered complainant's duties. Complainant had to pitch in when Onuh refused to serve non-Catholic inmates and their volunteers. ROI 115. As Floyd put it, Onuh often made complainant's work "more difficult" when he refused to serve other faith groups. ROI 104. Mobley, too, said that Onuh's disregard for non-Catholics "adds a lot of extra stress" and "extra work load" for complainant and others. ROI 114.

In addition to making extra work, Onuh interfered with complainant's work by interrupting Protestant services and scheduling conflicting Catholic services. ROI 66. As one inmate explained, Onuh insisted on keeping an 8:00 a.m. Sunday slot for mass — telling Catholic inmates to come for mass at 8 even if the chaplaincy scheduled it at other times. ROI 147-148.

Onuh undermined complainant's rapport with inmates and his authority over them. He informed prisoners that the Catholic community was "under attack" and that Protestant chaplains, like complainant, told them "lies." ROI 151-153. Complainant considered these comments particularly problematic, given his role in the prison. His job is to minister to inmates of all faiths; accordingly, he must seek their trust. Complainant and other BOP chaplains are also "Correctional Law enforcement Officers," and getting inmates "riled up," as Onuh did, is troubling and perhaps dangerous. ROI 115, 148.[10]

Onuh's anti-Protestant attitude further undermined the Religious Service's Department's mission to provide support for all faiths. The department had to change the schedule for

_____

[10] As Mobley explained, Religious Services employees "are [a]ll Correction Law Enforcement Officers [f]irst" and "[t]hat is why [they] receive Law Enforcement Pay." ROI 115.

18

Native American worship because Onuh proved unreliable.  ROI 58.
According to a Seventh Day Adventist prisoner, Onuh failed to
show up for non-Catholic group activities several times,
resulting in cancellation.  ROI 149.  While complainant cannot
sue on behalf of inmates or other employees Onuh injured,
McCollum v. California Dep't of Corr. & Rehab., 647 F.3d 870,
878 (9th Cir. 2011), evidence that Onuh repeatedly refused to
serve non-Catholic inmates helps to show his religious animus
towards complainant, Briscoe v. Fred's Dollar Store, Inc., 24
F.3d 1026, 1028-1029 (8th Cir. 1994) (noting that mistreatment
of black customers helped show "prevailing atmosphere of racial
animus against Blacks in general, and Black employees in
particular").

    There is some evidence of "personality conflicts" with Onuh
that may not implicate religion.  In Ford's view, complainant
suffered "a hostile work environment" but complainant's "issues"
with Onuh were "not about religion."  ROI 97.  Mobley said that
because there were no other Catholic leaders at the prison, she
was "unsure" whether he mistreated others because of their
religion or whether he would mistreat "everyone" equally.  ROI
115.  Furthermore, some of complainant's complaints to
management about Onuh's "yelling" and other conflicts do not
mention religious discrimination.  ROI 128-134; but see 139
(where complainant reported to a Human Resources Manager that
Onuh resists serving non-Catholics).

    When considered as a whole, the record provides significant
evidence that Onuh's actions and hostility had a religious
basis.  Evidence of "harassment must be viewed against all of
the circumstances and not in isolation."  Jackson v. Quanex
Corp., 191 F.3d 647, 664 (6th Cir. 1999).  When considering
motives, Title VII requires that "a protected characteristic was
a motivating factor" but it need not be the only factor.  Quigg
v. Thomas Cty. Sch. Dist., 814 F.3d 1227, 1238 (11th Cir. 2016);
Wright v. Murray Guard, Inc., 455 F.3d 702, 717 (6th Cir. 2006).
Here, assessing Onuh's motives in light of all the circumstances
means evaluating Onuh's general disagreeableness alongside his
comments about Protestant chaplains and his pattern of shirking
supervision of non-Catholic services.  Even if some of Onuh's
disagreeableness and unwillingness to help fellow chaplains were
due to personal issues, there is ample evidence that Onuh's lack

of caring for and feeling of not being responsible to non-Catholics played a prominent role in many of his actions.

This conclusion is supported by the measured statements of Supervisory Chaplain Clark, who noted that "Onuh sees workplace relationships as Protestants vers[u]s Catholics" because of his "own religious perspective." ROI 91. It was not the case that Onuh merely does not like to work; Clark said he "doesn't like to work with other faith groups." ROI 91. The record bears out Clark's assessment, as it does not describe Onuh's failure to supervise Catholic services or escort Catholic volunteers.[11]

Because chaplains must "share pastoral duties, supervision of inmate groups, and administrative functions," Onuh's refusal to serve non-Catholic inmates inevitably shifted work onto other chaplains, and this took place over a considerable period of time. ROI 61. Ford, for one, has had to work overtime when Onuh refused to serve non-Catholic inmates. ROI 90. And Clark said he would feel justified in bringing his own EEO claim, but fears it would not be taken seriously. ROI 92. Onuh's insults and outbursts regularly brought another chaplain to tears, but it appears BOP did nothing to stop his abuse. ROI 127.

## II.   BOP's Liability for Onuh's Behavior

An employer is liable for the harassment if the harasser is a coworker and the employer, after receiving notice of the harassment, is negligent in addressing and attempting to correct the harassment. Vance v. Ball State Univ., 570 U.S. 421, 424 (2013). An "employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment." Vance, 570 U.S. at 446. Onuh is complainant's coworker, not his supervisor, so BOP is liable only if managers "knew or should have known" of the harassment, Jackson, 191 F.3d at 664, and failed to take measures "reasonably calculated to

---

[11] The record does show that Onuh once treated a Catholic Religious Services Employee, Blackerby, harshly. ROI 152. But this one instance does not prove he is an "equal-opportunity harasser," Holman v. Indiana, 211 F.3d 399, 405 (7th Cir. 2000), nasty to everyone regardless of religion, given that he also made explicit, derogatory statements about Protestants. ROI 59.

end the harassment," <u>EEOC v. Xerxes Corp.</u>, 639 F.3d 658, 672
(4th Cir. 2011) (internal quotation marks omitted).  An employer
must take "prompt and appropriate remedial action."  <u>Huston v.
Procter & Gamble Paper Products Corp.</u>, 568 F.3d 100, 104 (3d
Cir. 2009).

Employer liability in this case depends on, among other
things, "the promptness of the employer's investigation when
complaints are made, whether offending employees were counseled
or disciplined for their actions, and whether the employer's
response was actually effective." <u>Xerxes Corp.</u>, 639 F.3d at
669.  It is not enough that management does *something* in
response to complaints.  It must "commit[] itself to resolving
the allegations." <u>Jackson</u>, 191 F.3d at 665 (holding that a
reprimand and other moderate measures that failed to stop
graffiti and slurs were inadequate).

The record shows that BOP management at the institution
knew about Onuh's harassment.  In 2013 and 2014 complainant
talked to former Supervisory Chaplain Danage.  ROI 62.  See
<u>Destiny H. v. Dep't of the Navy</u>, EEOC Appeal No. 0120130872,
2015 WL 9685599, at *5 (Dec. 10, 2015) (holding agency became
aware of harassment when victim told harasser's supervisor).
Admittedly, complainant listed many grievances in his emails to
Danage — most of them personal — but he also told Danage that
"as a Protestant" he had to do more work than Onuh when Onuh
refused to serve non-Catholics.  ROI 62, 88.  Moreover,
complainant told Danage about Onuh's accusing evangelicals of
"ruining the country."  ROI 61.  In addition, he told Danage he
had thought about filing an EEO complaint.  ROI 62.
Nevertheless Danage, Onuh's supervisor, did not begin to assess
Onuh's behavior and did not investigate further to learn whether
the harassment was pervasive, and religiously motivated.

Complainant also spoke to others around the same time,
including Human Resources Manager Hawk, Warden Upton, and an
Associate Warden.  ROI 127, 139, 132.  By telling Warden Upton
that he wanted to file an EEO complaint, complainant certainly
made it clear that he did not see the dispute as a personality
conflict.  ROI 62.  But managers nevertheless told complainant

to "ignore" Onuh and to "manage around" him." ROI 62, 66.[12]
Such a response may have been adequate for a mere personality
conflict, but "[w]hen an employer becomes aware of alleged
harassment" on the basis of a protected factor such as religion,
it has the duty to investigate the charges *promptly* and
thoroughly." Mayer v. Dep't of Homeland Security, EEOC Appeal
No. 0120071846, 2009 WL 1441519, at *5 (May 15, 2009) (emphasis
in original). BOP did not take any firm, forceful action to
address and respond to complainant's concerns. Indeed, many of
BOP managers' actions seem to have been motivated by the hope
that continuing problems would disappear on their own or would
be ignored by the other chaplains. While there are surely
religious discussions or disputes among chaplains of different
denominations that would not call for managers' intervention,
here the repeated and longstanding complaints called for some
investigation and corrective action. Onuh's pattern of
disparaging comments, harsh treatment of colleagues, and refusal
to serve non-Catholics goes beyond mere differences of opinion
in matters of faith.

Later, in 2017, managers had an even clearer picture of the
problem. Clark, who succeeded Danage, admitted that he believed
Onah acted inappropriately and with religious animus, so much so
that Clark considered filing his own EEO claim. ROI 91-92. He
told the investigator that, in his view, "Onuh sees workplace
relationships as Protestants vers[u]s Catholics." ROI 91.
Clark said he had "voiced [complainant's] concerns to the
Executive Staff." ROI 91.

Also in 2017, Clark acted on complainant's concerns. He
"had several conversations" with Onuh about his behavior and
"issued verbal reprimands." ROI 90. He told the EEO counselor
on March 28, 2017, that he had explained the problems to his
supervisor. ROI 27. He went so far as to refer Onuh for
investigation. ROI 90. The record does not describe the
investigation, but Onuh admits he "was written up" for failing

---

[12] It is not clear when complainant first spoke to the Warden
and Assistant Warden, but since he said he spoke to them about a
potential EEO complaint "back then," when he spoke to
Supervisory Chaplain Danage, this report was likely before April
2015, when Clark became Supervisory Chaplain. ROI 62, 88.

22

to escort volunteers. ROI 83, 85. By the time the EEO counselor spoke with Clark's supervisor, Associate Warden Catricia Howard, on April 6, 2017, she said that Clark had "made her aware of the situation" and she "[r]eferred it for appropriate action." ROI 27.

But these efforts – and it seems only Clark made efforts – did not succeed. Clark himself expressed dissatisfaction with the situation. ROI 92. In December 2017, more than six months after complainant filed his EEO complaint, Clark reported, in the present tense, that Onuh "doesn't like to work with other faith groups" and "sees workplace relationships as Protestants vers[u]s Catholics." ROI 23, 37, 91. It does not appear, from his testimony, that Clark regards Onuh's behavior as reformed. Indeed, Clark went on to say that he had considered filing an EEO complaint "and may still." ROI 92.[13]

The record does not show that managers took any additional action in light of Onuh's incorrigible behavior. Onuh continued to avoid escorting non-Catholic volunteers and to interfere with Protestant programming. In March 2018 he left the main facility so that he would not have to assist a Christian Science volunteer and that same month he announced and scheduled Catholic services in the time and space assigned to complainant. ROI 66. Complainant maintained that "in the year since [his] official complaint, [he] has seen no change in Chaplain Onuh's behavior." ROI 66.[14]

---

[13]  Clark's belated efforts would not likely relieve the BOP of responsibility, even had they stopped Onuh's behavior. "The Agency may not remove the effect of this initial inaction, i.e., avoiding liability, by its subsequent actions." Complainant v. Dep't of Veterans Affairs, EEOC Appeal No. 0120123232, 2015 WL 3484775, at *4 (May 21, 2015).

[14]  While only complainant's harms are directly relevant in this case, it is worth noting here that Onuh's intolerance of non-Catholics and managers' inaction affected many others. Inmates and volunteers also suffered. One group of Seventh Day Adventists found that Onuh closed the Religious Services area rather than facilitate their services, and reported that this happened "on several occasions." ROI 149. Because Onuh "could

23

## Decision

The record supports a claim of harassment based on religion.

## Remedies

The following relief is ordered:

1.   BOP shall take immediate steps to remedy the harassment and take steps reasonably calculated to prevent future harassment, consistent with 29 C.F.R. § 1614.501 (a)(2).

Such preventive and corrective action by BOP will include providing EEO training, particularly training on harassment, for Chaplain William Onuh.  In addition, BOP will provide training on harassment and on the supervisory obligation to timely address and report complaints of harassment for Supervisory Chaplain Jonathan Clark, Warden Jody Upton, Associate Warden Catricia Howard, and any other officials in complainant's chain of command at the Carswell, Texas facility that the BOP EEO Office determines need such training.

2.   Complainant is eligible for compensatory damages recoverable under Section 102 (a) of the Civil Rights Act of 1991.  This award is to be calculated based on complainant's proffer of evidence as to the harm suffered, the extent, nature and severity of the harm, and the duration of the harm caused as a result of BOP officials failure to remedy a hostile work environment based on religion.

---

not be relied upon" to serve the Native American worship group, the chaplains had to change their scheduled services.   ROI 58. Given that BOP has a constitutional and statutory duty to permit each inmate to practice his or her religion, Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 813 (8th Cir. 2008); 42 U.S.C. § 2000bb-1(a), it is particularly troubling that managers here have long ignored Onuh's refusal to serve non-Catholics.

Complainant shall submit his request for compensatory damages and supporting documents, including medical documentation, if any, of injuries suffered as a result of the religious harassment, to Carolyn Sapla, Acting EEO Officer, Federal Bureau of Prisons, 320 First Street, N.W., Room 936, Washington, DC 20534.  A copy of the request should be submitted to the Complaint Adjudication Office as well.  Following its receipt of the compensatory damages request, BOP should either award the amount requested or determine what amount it considers an appropriate award.  BOP and complainant should then attempt to agree on the compensatory damages award.  If a mutually acceptable amount cannot be agreed upon, the parties should notify the Complaint Adjudication Office, which will then issue a decision determining an appropriate award.

3.    Complainant is statutorily entitled to reasonable attorney's fees incurred pursuant to her successful hostile work environment claim.  29 C.F.R. § 1614.501(e).  If complainant's attorney is eligible for an award of attorney's fees, then within thirty days of receipt of this decision, complainant's attorney shall submit a verified statement of costs and an affidavit itemizing the attorney's fees to Carolyn Sapla, Acting EEO Officer, Federal Bureau of Prisons, 320 First Street, N.W., Room 936, Washington, DC 20534.  A copy of this statement should be sent to the Complaint Adjudication Office as well.  29 C.F.R. §1614.501(e)(2).

    If a mutually acceptable figure for the attorney's fees cannot be agreed upon, the parties should notify the Complaint Adjudication Office, which will then determine an appropriate award.  29 C.F.R. §1614.501(e)(2)(ii)(A).

4.    BOP shall post a notice for sixty days within the BOP Carswell, Texas facility, consistent with 29 C.F.R. § 1614.501 (a)(1).

5.    BOP shall submit a report on the status of the implementation of the relief ordered in this case to the

Complaint Adjudication Office within ninety days of this
decision.

Robert K. Abraham
Acting Complaint Adjudication Officer

April J. Anderson
Complaint Adjudication Office

26